**In re Richard Morton GREEN, Jr.**

Supreme Court of Delaware.

Submitted: Jan. 16, 1989.
Decided: Jan. 30, 1989.

Carl Schnee of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for respondent.

Clark W. Furlow, Secretary of the Bd. of Bar Examiners.

Before MOORE, WALSH and HOLLAND, JJ.

PER CURIAM.

The Board of Bar Examiners (the Board) has petitioned this Court, pursuant to its exclusive control over the Bar of this State,[1] to confirm the Board's authority to disclose to appropriate state, federal and military authorities for possible criminal prosecution or other appropriate action, certain information gathered by the Board in connection with the application of Richard Morton Green, Jr., for admission to the Delaware Bar. Mr. Green does not challenge the factual matters set forth by the Board, but alleges that there is a privacy interest in such matters which precludes disclosure. We find no such privacy interest. Accordingly, the Board's petition will be granted in all respects.

I.

The facts are not in dispute. At a meeting of the Board on June 17, 1988, Mr. Green's application for admission to the Bar was rejected upon a finding that he had failed to produce satisfactory evidence that he is a person of good moral character and reputation and that he possesses such qualities, aptitudes and disposition as fit him for the practice of law. See Supreme Court Rule 52(a)(1). This decision was based on the fact, disclosed in Mr. Green's application, that he had been found guilty of plagiarism while in law school, and had been suspended for one semester.

By letter dated June 21, 1988 the Board informed Mr. Green of its decision and of his right to petition for a hearing pursuant to Board Rule BR–51.6. Mr. Green requested such a hearing and asked that it be scheduled before July 7 so that it not conflict with his obligation to be on active duty with the United States Army Reserve in Virginia. He is a Lieutenant in the Military Intelligence Branch of the United States Army Reserve. Accordingly, the hearing was scheduled for July 1, 1988.

In Mr. Green's petition for the hearing he stated that the alleged plagiarism incident was a cruel hoax perpetrated against him by members of a fraternity for which he had been a dormitory supervisor. He claimed that his version of the episode, which was detailed in his petition, had been verified by an extensive investigation undertaken by the United States Government prior to granting him a top secret security

1. See *In Re Nenno,* Del.Supr., 472 A.2d 815, 819 (1983).

clearance for his service in the Army Reserve.

At the hearing on his petition Mr. Green testified, but he offered no witnesses in support of his contentions. Instead, he submitted a letter attesting to his good character, purportedly signed by a United States Army Brigadier General Donald I. Burke, and bearing a return address of "Suite 281, 3650 Silverside Road, Wilmington, Delaware". He also submitted a memorandum, purportedly signed by a United States Army Captain Daniel L. Slaney, bearing the same return address as the "General Burke" letter. The Slaney memorandum referred to three confidential documents which were allegedly the product of the United States Government's investigation of the plagiarism incident. This memorandum stated that these documents had been taken from the files of the Central Intelligence Agency. Two were memorandums summarizing purported interviews conducted by government investigators, who allegedly confirmed that Mr. Green was the victim of a hoax and not guilty of plagiarism. The third was a re-port summarizing the results of a purported polygraph examination indicating that Mr. Green had told the truth to government investigators when he denied having committed plagiarism in law school.

Mr. Green informed the Board that these three confidential documents had been hand delivered to him that morning by Captain Slaney with instructions that they could be shown to the Hearing Panel but could not be retained or photocopied by the Board, and they were not to be made a part of the Board's record. Mr. Green said that he was to return them to the appropriate military authorities later that day.[2]

The Hearing Panel of the Board (the Panel) declined to rule on Mr. Green's petition until it could authenticate his documentary evidence. Accordingly, the Panel adjourned and instructed Mr. Green and the Board's presenter, W. Harding Drane, Esquire, to arrange for the attendance of Captain Slaney on July 6, 1988 when the Panel would reconvene.

Immediately after the hearing, Mr. Drane wrote to Captain Slaney requesting

---

**2.** Purporting to be on stationery of the Central Intelligence Agency, the Slaney memorandum stated in part:

    2. As you know, 1st LT Green holds a TOP SECRET security clearance with access to SENSITIVE COMPARTMENTED INFORMATION. To obtain this clearance, 1st LT Green's background, including his character, was subjected to an extensive four month investigation. Each and every aspect and reference related to 1st LT Green was scrutinized as (sic) a cost of over $50,000.

    3. Enclosed are documents from 1st LT Green's investigative file which is located in our office. The documents relate to the plagiarism charge that supposedly took place at Delaware Law School which your group is currently investigating.

    4. Specifically, included are two classified disposition forms that were created by the respective agency investigators who interviewed the individuals whose testimony regarding the plagiarism incident had bearing on 1st LT Green's moral fitness to qualify for his security clearance. Also, included is one disposition form summarizing the results of 1st LT Green's polygraph examination regarding the alleged plagiarism incident. A letter from BG Donald I. Burke shall serve as record of the decision with respect to 1st LT Green's security clearance hearing disposition.

    5. These enclosures shall not be copied, xeroxed or in any way duplicated, and shall only be viewed by the individuals who appear on Annex A of this letter. The individuals who are permitted access to the information contained therein are hereby cautioned that such sensitive information is classified CONFIDENTIAL by the United States government and such individuals viewing the information may not release information from the classified documents in any manner without express authorization from this office.

    6. 1st LT Green is the custodian of these documents and they must be returned to him and may not be included in any transcript or record of the hearing. Reference to the documents in (sic) permitted, but any dialogue regarding their contents and any transcript or record of your hearing is forbidden.

    7. These documents carry an overall classification of CONFIDENTIAL because they may reveal procedures and situations that an agency uses in gathering information necessary to grant or deny a security clearance. Such information may be valuable to hostile intelligence gathering services and the classification and regulations surrounding such classification, serves to protect our interest in the security of the background investigation.

    8. Questions may be referred to 1st LT Green or forwarded to the above address.

that he contact Mr. Drane for the purpose of arranging his appearance before the Hearing Panel. Mr. Drane directed an employee of his office to hand deliver that letter to "Suite 281, 3650 Silverside Road, Wilmington, Delaware," the address given by Captain Slaney in the purported Slaney memorandum. When she did so, she learned that the address was the home of a privately-owned and operated "Post Office" known as the Mail and Business Center and that "Suite 281" was merely a post office box.

On July 6, 1988 the Panel reconvened. Captain Slaney did not appear, and Mr. Drane submitted the affidavit of his employee describing her efforts to deliver the letter to Captain Slaney. The Panel then directed Mr. Drane to inform Mr. Green that it was prepared to enter its order finding that Mr. Green had failed to introduce competent evidence sufficient to meet his burden under Supreme Court Rule 52(a)(1) and Board Rule BR–51.6. Since Mr. Green, purportedly, was to be on active duty with the Army Reserve through July 17, and therefore would not return until shortly before the Bar Examination, the Panel granted him a further opportunity to authenticate the Slaney memorandum and its related documents, and to introduce further evidence in support of his petition. The Panel offered to adjourn the hearing to a date after the Bar Examination and to allow Mr. Green to sit for the Bar Examination if he would agree that his results on the examination would not be made known to him unless he sustained his burden of proof at an adjourned hearing.

Mr. Green had previously stated that he would not be able to receive telephone calls while he was on active duty with the U.S. Army Reserve. However, he promised to call Mr. Drane on Friday, July 8, to learn the results of the July 6 reconvened hearing. No such call was received on that date from Mr. Green. On July 12, Mr. Drane wrote to Mr. Green by certified mail, return receipt requested, informing him of the Hearing Panel's decision and enclosing a copy of the transcript. The return receipt indicates that this letter was delivered on July 13.

On July 14, an envelope addressed to Mr. Drane was posted at the Talleyville branch of the United States Post Office. It contained a letter and an affidavit, both dated July 11, 1988 and purportedly signed by Captain Daniel L. Slaney. The Slaney letter stated:

> As you know, I will not be able to appear before the Board of Bar Examiners of the State of Delaware.
>
> I have therefore prepared an affidavit which will supply the Board with the necessary authentication of my correspondence of June 30, 1988 ...

The Slaney affidavit stated that: (a) Captain Slaney is "employed by the United States Government as an agent of the Central Intelligence Agency," and his "address and telephone number are unavailable"; (b) Captain Slaney may only be contacted through the address at "Suite 281, 3650 Silverside Road, Wilmington, Delaware"; (c) Captain Slaney hand delivered to Mr. Green at 7:30 on the morning of July 1, 1988, the letter of Brigadier General Burke,[3] the Slaney memorandum of June 30 (which the affidavit refers to as a "letter"), and the three investigative documents taken from Mr. Green's military dossier; (d) the three investigative documents were returned by Mr. Green to "a

---

**3.** The letter purportedly signed by a General "Donald I. Burke" stated:

> Richard M. Green, Jr., was granted a TOP SECRET security clearance with ACCESS TO SENSITIVE COMPARTMENTED INFORMATION after an exhaustive investigation and hearing was conducted into his personal affairs. The hearing included a polygraph examination regarding the plagiarism incident in Green's background and interviews of two individuals related to the subject who consented to be interviewed. It should be noted that

> the other individuals in the ... fraternity would not consent to an interview.
>
> Richard M. Green, Jr., is an individual with proven good character and unsurpassed moral fitness. He has served the United States admirably, and has proven time and task again that he is of superior integrity. The dedication and commitment he displays each day are models for all intelligence officers. I would certainly hope that the Board of Bar Examiners of the State of Delaware also find as such.

courier" later that day; and (e) Captain Slaney telephoned Mr. Drane's office at 8:45 a.m. on July 6 and left a message that "he would not consent to an appearance before the Board of Bar Examiners of the State of Delaware [because] [t]he sensitive nature of [his] employment and assignment will not allow such." The affidavit was purportedly notarized in the District of Columbia by a District of Columbia notary public "Mary L. Burke".

Mr. Drane received the Slaney letter and affidavit on July 15, 1988. That same day, a member of the Board of Bar Examiners, who had originally investigated Mr. Green's character, received a letter from Mr. J. Edwin Dietel, Deputy General Counsel of the Central Intelligence Agency. Mr. Dietel's letter stated in pertinent part:

> The Central Intelligence Agency has no record of Mr. Green currently holding a security clearance, having been a subject to a background investigation by this Agency, or of any past or present association between Mr. Green and the CIA. Furthermore, the copy of the letter he sent you on letterhead using the CIA's seal and name, appears to be a forgery; no such stationery is in use by this Agency. In addition, there is no record in this Agency of the individuals who allegedly signed the documents Mr. Green provided to you ever having been employed by this Agency, or authorized to submit or to sign such letters on behalf of this Agency or receiving security clearances from the Agency.
>
> I hope this information is of use to you. This Office intends to report this matter to the U.S. Department of Justice as a possible violation of Federal criminal law. If you have any questions or need further assistance in this matter, please contact Mr. Page Moffett, Chief, Administrative Law Division ...

Later that day, Mr. Drane received a letter by telecopy from Harry D. Brown, Assistant to General Counsel of the Department of the Army, informing the Board that:

> Based upon a review of personnel file systems, the United States Army currently has no record of any Donald I. Burke or Daniel L. Slaney in either the active or reserve components of the Army. Additionally, we have no record of a General Burke in a retired status.

In light of this new information, members of the Board and Mr. Drane conferred during the afternoon of July 15 and decided to schedule an immediate meeting with Mr. Green and his preceptor to advise them of what the Board had learned. That meeting was held the following Monday, July 18, 1988. In attendance were Mr. Green, his preceptor, as well as a member of the Board, the Board's Secretary, and Assistant Secretary and Mr. Drane. Mr. Green and his preceptor were informed of the information provided by the CIA and the U.S. Army and gave them copies of the pertinent correspondence. The Board's Assistant Secretary cautioned Mr. Green that the evidence gathered by the Board appeared to involve criminal conduct by Mr. Green, and as a consequence he should be aware that, in the event of criminal prosecution against him, anything he might say concerning the evidence in the Board's possession could be used against him.

The Board's Secretary then informed Mr. Green that he anticipated that the investigative committee of the Board would supplement the grounds upon which the Board had based its determination to deny his application to add the Board's concern that he had apparently committed perjury and submitted forged evidence to the Board. The Secretary further informed Mr. Green that there was a substantial probability that when the Hearing Panel learned of these additional matters, it would not permit him to delay the conclusion of his hearing until after the Bar Examination.

Mr. Green then conferred privately with his preceptor. Following that, the meeting reconvened and Mr. Green stated that he needed additional time to gather evidence for presentation to the Board. Accordingly, he stated that he would agree not to sit for the Bar Examination if that would eliminate the need for the Hearing Panel to decide his petition before the date of the Bar Examination.

By letter hand delivered to the Board's Secretary later that day, Mr. Green put this request in writing. That same day, the Secretary circulated a memorandum describing the above circumstances to members of the Board. After receiving those materials and having their votes taken by telephone, the Board directed the Secretary to inform Mr. Green that the reasons for the Board's rejection of his application, as originally set forth on June 21, 1988, would be supplemented to allow the Board to consider his apparent submission of forged documents and his apparent perjury. The Secretary so notified Mr. Green by letter dated and received by him on July 19, 1988.

Mr. Green did not sit for the Bar Examination and the Board scheduled the reconvened hearing for August 18 and 19. Meanwhile, the Board continued its investigation. It learned that the Post Office Box at the Silverside Road address had been rented in the name of "Daniel L. Slaney or D.L.S." who listed his address as "19 Amphib. Recon Battalion APO, New York, NY 55613". The Board then learned from Harry D. Brown, Assistant to the General Counsel of the United States Army, that there was "no such Army unit" as the "19 Amphib. Recon Battalion," and that the "APO" listed for the non-existent unit was "invalid".

The Board also sought information concerning Mary L. Burke, the purported District of Columbia notary public who notarized the Slaney affidavit. It contacted Josephine Simmons, the Chief of the Notary Commission and Authentication Office of the District of Columbia, who informed the Board that "the Notary Office has searched all records and that search revealed *no record indicating that Mary L. Burke is a notary public in and for the District of Columbia.*" (Emphasis in the original).

On August 15, 1988, the Board received a response from the Defense Investigative Service of the United States Department of Defense, the agency which had investigated Mr. Green for his top secret security clearance and allegedly found the plagiarism charges to be baseless. Attached to the letter were various documents from the files of the Defense Investigative Service concerning Mr. Green, including a "Request for Personal Security Investigation" (DD Form 1879), the Defense Investigative Service Report of Investigation dated August 5, 1987 [DIS Form 1(8–72)], various attachments to the Report of Investigation, including Credit Bureau records, and Mr. Green's Department of Defense personnel security questionnaire (DD Form 306). Instead of exonerating Mr. Green, these files reveal that the military investigation conducted by the Defense Investigative Service did not uncover the fact that he had been suspended from law school for plagiarism. Thus, contrary to Mr. Green's assertions, it is clear from the records of this agency that it had not examined the allegations of plagiarism, and certainly had not cleared him of the charges.

On August 16, 1988, Mr. Green contacted Mr. Drane. He stated that he was considering withdrawing his petition so that the hearing would not have to be held. Later that day, he discussed the matter with the Board's Secretary. The next morning, August 17, 1988, Mr. Green hand delivered a sealed envelope to the Secretary. Before opening the envelope, the Secretary told Mr. Green that the withdrawal of his petition would terminate his challenge to the Board's decision to deny his application, and that as a result, the Board's decision would stand, the reasons for its decision would go unchallenged, and the hearing scheduled for the following day would be cancelled. The Secretary also informed Mr. Green that the circumstances of his application would be disclosed to the Delaware Supreme Court, the National Conference of Bar Examiners, and all bar examining agencies. He further informed Mr. Green that the withdrawal of his petition would not prevent the Board, if it chose to do so, from bringing the information in its investigative files to the attention of the appropriate state, federal and military authorities for possible criminal prosecution. He further emphasized that the contents of the then still-unopened envelope might contain admissions which could be used against Mr. Green in the event of such a

criminal prosecution. He then asked Mr. Green whether, in light of all of the foregoing, he still wished to deliver the envelope and its contents to the Board. Mr. Green stated that he did, and the Secretary opened the envelope finding a letter dated August 16, 1988, withdrawing Mr. Green's petition.

The Secretary informed the Chairman of the Board of the foregoing and on August 17, the Chairman called an emergency meeting of the Board for Friday, August 19, to consider how the Board should respond to these matters. At that meeting, the Board decided to notify immediately the National Conference of Bar Examiners that Mr. Green had been rejected in Delaware on character grounds. Additionally, the Board decided that it should report the information gathered by it concerning Mr. Green to the appropriate state, federal and military authorities. Pursuant to that decision the Board applied to the Court for an Order confirming its authority to so inform those agencies. That petition was filed with this Court on September 7, 1988.

On the same day this Court entered an Order directing Mr. Green to show cause in writing by September 19, 1988 why the Board's petition should not be granted. That Order was received by Mr. Green on September 8, 1988. On September 15, 1988 Mr. Green requested an extension to October 3 to respond to the petition. That request was granted.

On October 3, 1988, Mr. Green's counsel filed a response opposing the petition and requested further time to conduct the necessary factual investigation and legal research to fully respond to the petition. As a result, Mr. Green was granted a further extension until November 7, 1988, and after a further request, an additional extension was granted to November 14, 1988.

On November 14, Mr. Green's supplementary response to the petition was filed.

Despite a full opportunity to investigate the matters, no challenge is made by Mr. Green or his counsel to any of the factual assertions in the petition.

II.

In his response, Mr. Green recognizes that pursuant to Board Rule BR–52.11(c), the Board may release confidential information concerning an applicant to licensing, disciplinary, or law enforcement agencies of any jurisdiction and to the National Conference of Bar Examiners.[4]

However, Mr. Green challenges the proposed action by the Board to release confidential information to the foregoing agencies on the ground that his constitutional right of privacy will be violated. Thus, he contends that the constitutional right of privacy involves two separate interests: (1) the individual interest in avoiding disclosure of personal matters, and (2) the interest in independence in making certain kinds of important decisions. See *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). It is claimed that the interest in independence in making certain kinds of important decisions is illustrated by *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Mr. Green argues that the Supreme Court of the United States recognized the constitutional right of privacy and applied the strict scrutiny test requiring the State to show a compelling interest in regulating an individual's decision concerning contraception and abortion. Under this test, the State's interest was balanced against the individual's right to privacy.

As to an individual's interest in avoiding disclosure of personal matters, Mr. Green acknowledges that the potential scope of such interest is "broad and has yet to be fully defined".

---

**4.** Mr. Green does not appear to contest the Board's authority to disclose its information to the National Conference of Bar Examiners and other bar examining agencies. Indeed as part of his application to the Delaware Bar, Mr. Green signed, under oath, an authorization and release in which he expressly authorized "the Board ... to communicate to the National Conference of Bar Examiners and to the Bar Examiners or Board of Professional Responsibility or comparable authority of any other state, any information concerning me obtained in the course of their investigation and the results of such investigation."

The Board responds that there are no constitutionally protected privacy interests here. The determination of that issue involves two questions: (1) whether the claimed right to privacy exists and (2) if so, the scope of that right. *Woods v. White,* 689 F.Supp. 874, 875 (W.D.Wisc.1988).

### III.

An applicant for the Delaware Bar completes a questionnaire containing the cautionary instruction that "the Board's inquiry into an Applicant's moral character emphasizes honesty, fairness and respect for the rights of others and for the laws of Delaware and the United States." The instructions further quote verbatim the text of Board Rule BR–52.3 which emphasizes the applicant's "duty to be candid and to make full, careful and accurate responses and disclosures in all phases of the application and admission procedures."

There is no privacy interest subject to protection here. Mr. Green could not reasonably have expected that the Board would keep information suggesting a violation of law secret from law enforcement authorities. See Board Rule BR–52.11(c), which provides that:

> The Board may release confidential information concerning an applicant to ... law enforcement agencies of any jurisdiction.

Having conducted himself in a manner which gives rise to a reasonable belief that he has perjured himself and submitted forged documents to the Board, Mr. Green cannot be heard to complain that the disclosure of these apparently criminal acts to the Department of Justice of the State of Delaware would violate his right of privacy. Similarly, he can have no reasonable expectation that the fact that he has apparently submitted forged documents on a forged CIA letterhead will be concealed from the appropriate federal authorities. Finally, he has no reason to expect that his apparently false representations with respect to his military security clearance would be concealed by the Board from the appropriate military agencies with responsibility for the maintenance of such security clearance. If anything, there is a strong public purpose involving national security to make sure that such agencies have such information.

Any interest Mr. Green may have in keeping private his submission of apparently forged documents and perjured testimony to the Board must give way to the public purposes to be served by disclosure. Those purposes include the national defense interest in having the armed forces free of one who forges documents or who commits perjury, the public interest in not having such an individual in positions of trust in which those with law degrees may be employed, even in the absence of being admitted to a bar, and to protect the public confidence in the bar and the bar admission process, so that one who attempts to defraud the Board will be held fully accountable for his actions. See *In re John J. Green, Jr.,* Del.Supr., 464 A.2d 881, 885 (1983).

Accordingly, an Order essentially in the form submitted by the Board is hereby entered this day confirming the Board's authority to disclose to appropriate state, federal and military authorities for possible criminal prosecution or other appropriate action, information gathered by the Board in connection with its investigation of Richard Morton Green, Jr.

### ORDER

This 30th day of January, 1989, it appearing that:

A) The Board of Bar Examiners of the State of Delaware (the "Board") denied the application of Richard Morton Green for leave to take the 1988 Delaware Bar Examination because the Board found that Mr. Green had failed to satisfy Supreme Court Rule 52(a)(1) which requires that an applicant for admission produce evidence satisfactory to the Board that

> he is a person of good moral character and reputation and that he possesses such qualities, aptitudes, and disposition as fit him for the practice of law.

S.Ct.R. 52(a)(1).

B) Mr. Green submitted a petition pursuant to Board of Bar Examiners Rule

BR–51.6 for a hearing with respect to the Board's decision denying his application.

C. Mr. Green withdrew that petition prior to the rendition of a decision by the Hearing Panel of the Board with the result that the Board's original decision to reject his application and the reasons upon which that decision was based stand unchallenged.

D. The Board has filed with the Court a petition dated September 6, 1988, detailing evidence developed by the Board in connection with its investigation of Mr. Green which evidence strongly suggests that Mr. Green attempted to deceive the Board by submitting forged documents to the Hearing Panel and perjuring himself in his sworn testimony before the Panel. This attempted deception apparently involved documents which falsely purported to have been taken from the files of the Central Intelligence Agency, communications purportedly from military officers familiar with Mr. Green's service files, and false testimony by Mr. Green concerning the government's investigation in connection with his military security clearance.

E. The Board's petition requests that this Court enter an Order confirming the Board's authority to disclose to the appropriate State, Federal and military authorities for possible criminal prosecution or other appropriate action the information gathered by the Board during its investigation of Mr. Green.

NOW, THEREFORE, IT IS ORDERED that:

1. The Board shall submit a report substantially in the form of its September 6, 1988 petition together with a copy of this Order to the appropriate State, Federal and military authorities so that those agencies can take such action as they deem appropriate with respect to the evidence gathered by the Board.

2. The Board shall notify the Bar Examining Agencies of all jurisdictions within the United States of America and its territories that it has rejected Mr. Green's application on the ground that he failed to produce satisfactory evidence that he is a person of good moral character and that he possesses such qualities, aptitudes, and disposition as fit him for the practice of law, and the Board shall forward to each such agency a copy of this Order. The Board shall further advise such agencies that additional information will be available upon request and shall submit to any agency making such a request a copy of the report submitted by the Board pursuant to paragraph 1 of this Order.

3. Mr. Green's application and the Board's files with respect to its investigation of Mr. Green's application shall be retained by this Court as a permanent part of its records.